FILED
04/23/2019
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 5, 2018 Session

## JOE LOGAN DIFFIE v. THERESA CRUMP DIFFIE

**Appeal from the Chancery Court for Williamson County**
**No. 44100     Joseph A. Woodruff, Judge**

———————————————————

**No. M2018-00267-COA-R3-CV**

———————————————————

In this divorce action, the husband contends the trial court erred in the division of marital property in awarding 60% of the marital estate to the wife and 40% to the husband, and in its decision to award the wife all four types of alimony. The wife takes issue with the amount of alimony awarded to her, and both parties seek attorney's fees on appeal. We affirm the award of alimony *in solido*. As for the awards of alimony *in futuro* and transitional alimony, an award of alimony must be based on the factors known at the time of the hearing, *Ford v. Ford*, 952 S.W.2d 824, 829-30 (Tenn. Ct. App. 1996); however, the trial court considered the husband's "speculative income," that being what he might earn in the future, in setting the amount of alimony *in futuro* and transitional alimony. Accordingly, we reverse the amounts awarded for *in futuro* and transitional alimony and remand to the trial court to make additional findings of fact and conclusions of law to determine the wife's need for each category of alimony and the husband's ability to pay based upon the relevant factors and facts known at the time of the divorce, and enter judgment accordingly. We vacate the award of rehabilitative alimony because it was not requested, and there is no competent evidence to support an award of rehabilitative alimony. Moreover, because we have affirmed the finding that the wife is entitled to receive transitional alimony, which should be awarded only when rehabilitation is not necessary, *see* Tenn. Code Ann. § 36–5–121(d)(4), she may not be awarded rehabilitative alimony. Additionally, we decline the husband's request to recover his attorney's fees on appeal but grant the wife's request and remand this issue for the trial court to award the fees and expenses she incurred on appeal that were reasonable and necessary.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part, Reversed in Part and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which RICHARD R. DINKINS and W. NEAL MCBRAYER, JJ., joined.

William L. Moore, Jr., Gallatin, Tennessee, for the appellant, Joe Logan Diffie.

Edward Paul Silva and William Philip Holloway, Franklin, Tennessee, for the appellee, Theresa Crump Diffie.

## OPINION

Joe Logan Diffie ("Husband") and Theresa Crump Diffie ("Wife") were married in March 2000. In May 2015, Husband filed for divorce in Williamson County Chancery Court asserting grounds of irreconcilable differences. Wife answered and filed a counter-claim on the grounds of adultery. The trial court allowed Husband to file an amended and supplemental complaint for divorce, in which he added the additional ground of Wife's inappropriate martial conduct. The five-day bench trial took place June 19–21 and October 10–11, 2017.

The parties were married for 17 years. At the time of trial, Wife was 48 years old and Husband was 58. Wife had not previously been married, while this was Husband's third marriage. The couple has one child together who was 13 at the time of trial. Wife has no other children. Husband has five other adult children from previous relationships.

Wife graduated high school in 1987. Following high school, Wife enrolled in the police academy, and upon graduation, she became a sworn police officer in Perry, Florida. After a year with the police department, Wife worked for TransCor America, a company that transports prison inmates. Approximately one year later, Wife moved to New York, where she managed a restaurant and briefly enrolled in community college. She then moved to Texas where she managed a restaurant in the Dallas/Fort Worth area. Less than a year later, Wife moved back to Florida where she took a job doing miscellaneous office work for a construction company in Orlando. Soon thereafter she was promoted to the position of payroll clerk. Wife was working in this job in early 1999 when she met Husband.

Husband obtained his high school diploma and served on active duty in the military before being honorably discharged. He moved to Nashville in 1986 where he established a successful music career as a country music recording artist and songwriter. As a recording artist, his debut single went to number one on the country music charts. Husband also enjoyed great success as a songwriter. The first six songs Husband wrote went to number one. He performed live concert engagements, appeared on television shows, and his songs were a staple on the playlists of radio stations in the country music market. Although Husband's music career peaked in the mid-1990s, he remains a celebrity and is very popular among fans of country music, and he continues to play concerts and tour.

In early 1999, Wife met Husband backstage after one of his concerts. The parties began dating immediately and, to quote songwriter Dennis Linde, "Everyone knew it was love from the start."[1] The parties married a year later in March 2000.[2] During the early years of marriage, Wife traveled with Husband as he toured and performed. After Wife became pregnant with the couple's child, she stopped travelling with Husband a few months before the baby was due. Their daughter, Kylie, was born in May 2004. After that, the parties made a joint decision for Wife to stay home and care for their daughter and household. Wife remained unemployed outside the home for the duration of the marriage.

Over time, the parties' relationship soured. Husband admitted being involved in numerous extramarital affairs throughout the marriage. In February 2014, Husband began an extramarital relationship with a woman referred to as "TT" in the official record. A considerable amount of time at trial was spent presenting evidence of the great lengths Husband went to conceal his relationship with TT, and the dissipation of marital funds. Specifically, Husband gave TT a credit card under his manager's name and agreed to pay it off after the divorce was final. Husband kept this information from Wife with the help of his manager.

Regarding the couple's finances, the parties enjoyed a standard of living that exceeded their income during the marriage, which resulted in a gradual dissipation of assets to support their lifestyle. Husband's excessive generosity towards his adult children was a significant contributing factor in the couple's diminishing finances, as was Husband's lifestyle on the road, which included the pursuit of his relationship with TT. After Husband filed for divorce, Wife began working part time at a retail book store where she works approximately three days a week earning seven dollars an hour. For purposes of calculating Wife's income, the trial court imputed Wife with full-time minimum wage earnings of $1,256 per month. Husband continues to tour and reasonably maximize his earning potential, grossing over $1.7 million in income in 2016.

Testimony regarding the health of the parties was presented at trial. Wife has been diagnosed with rheumatoid arthritis for which she takes prescription medication under the supervision of a medical doctor. Husband is in reasonably good health and offered no evidence of chronic health problems for which he receives medical treatment.

---

[1] JOE DIFFIE, *John Deere Green*, *on* HONKY TONK ATTITUDE (Epic Records 1993).

[2] On March 10, 2000, prior to the marriage, the parties entered into a pre-nuptial agreement; and by its own terms, the pre-nuptial agreement expired on March 9, 2009, which was prior to the commencement of the divorce proceedings.

The parties jointly retained an accounting firm to appraise some of their intangible assets. The parties' joint expert performed a valuation of Husband's song catalogue for songwriter and artist royalties only for the songs written and recorded during the marriage and assigned a value of $13,600. The expert did not render an opinion, and no value was assigned, for songs Husband wrote or recorded prior to the marriage.

Husband had a pension plan connected with his membership in the American Federation of Television and Radio Artists ("AFTRA"), the recognized union for television and radio performers. The aggregate amount of contributions paid into Husband's AFTRA account during the marriage was calculated to be $11,607. However, no value was assigned to Husband's premarital contributions, and there was no evidence presented of the AFTRA pension benefit's present or future value.

All of the parties' income flowed through JLD, Inc., a subchapter S corporation, of which Husband is the sole owner. JLD, Inc. was created prior to the marriage. The company provides a limited liability shield between claims of creditors and the parties' personal assets. The value of JLD, Inc. stock is completely dependent upon Husband's ability to generate income as a performing artist. All revenue is used to pay creditors, pay expenses associated with Husband's activity as a performing artist, pay the parties' personal expenses (including estimated federal income tax payments) or distributed to the parties as joint income. Because Husband's touring activity is cyclical, the value of JLD, Inc. fluctuates greatly month to month. The parties' joint expert performed a valuation appraisal of JLD, Inc. and assigned a value of $48,000 for the corporation. This value is not disputed by the parties.

The most valuable marital asset was the parties' home, located on Weatherly Drive in Brentwood, Tennessee, which had a fair market value of $860,000. The existing mortgage on the house was $246,744 at the time of trial. The couple also owned several vehicles, and had numerous investment and financial accounts. Additionally, the parties owned several assets directly used by Husband in his career as a performing artist. This included a 2004 Prevost XL-2 bus used for touring, valued at $180,000, a 2015 Wells Cargo trailer valued at $9,500, and music equipment valued at $47,080. Lastly, the parties' expert presented evidence of a 2016 income tax overpayment in the amount of $21,729. The value of all assets is not disputed by the parties.

After the trial concluded, the parties conferred and filed an agreed parenting plan with the trial court which addressed all issues pertaining to child custody, parenting and support. The trial court adopted the parenting plan by order on October 30, 2017. On November 20, 2017, the trial court issued a Memorandum and Order granting Wife a divorce on the grounds of inappropriate marital conduct and addressed the outstanding issues of the division of martial property and spousal support.

The trial court first classified the parties' separate property. It determined that a $25,000 payment Husband made to Wife under the terms of the pre-nuptial agreement, and all earnings on the investment of those funds, was Wife's separate property. To the extent Husband earned participation rights in the AFTRA pension plan prior to the marriage, the trial court determined those rights were Husband's separate property. The trial court relied on the AFTRA statements to determine the amount of contributions made during the marriage, but assigned no present or future value for the pension. The trial court determined that all royalties and future income from Husband's songs written and recorded prior to the marriage were Husband's separate property. For some unknown reason, the parties' joint expert did not perform a valuation on Husband's premarital song catalog. Accordingly, the trial court did not assign a value to Husband's separate premarital song catalogue; however, the trial court is not faulted for this because it can only make determinations upon the evidence presented.[3]

To the extent JLD, Inc. was separate property at the time of the marriage, the trial court determined it had been transmuted into marital property because no steps were taken to preserve the company as separate property. It then concluded that

> a mathematically equal division of the marital estate would not be equitable. Wife is economically disadvantaged relative to Husband. He has the far greater ability to accumulate capital assets than does Wife. Several marital assets, such as the tour bus, music equipment, song catalogue, and JLD, Inc. stock are critical to Husband's ability to continue to pursue his successful career as a performing musician.

Thus, the trial court divided the marital estate as follows:

| To Husband | | To Wife | |
|---|---|---|---|
| 2013 Ford F150: | $18,276 | 9435 Weatherly Dr. | $860,000 |
| 2004 Prevost XL-2: | $180,000 | 2007 Mercedes E350: | $5,630 |
| Sun Trust Inv. #3112: | $258.43 | 2010 Jeep Wrangler: | $17,523 |
| Sun Trust Acct. #1521: | $2,045 | Sun Trust Chk.# 3116: | $116 |
| Sun Trust Acct. # 3868: | $10,656 | Chas. Schwab IRA #1985: | $8,017 |
| Chas. Schwab # 3015: | $40,038 | Janus Funds #4335: | $27,103 |
| Chas. Schwab # 3018: | $89,175 | Buffalo Funds #7635: | $32,042 |
| Music/Song Catalogue: | $13,600 | | |
| AFTRA Pension: | $11,607 | | |

---

[3] Tenn. Code Ann. § 36-4-121(c) states that, "[i]n making equitable division of marital property, the court shall consider all relevant factors including: . . . (6) The value of the separate property of each party[.]"

| | | | |
|---|---|---|---|
| Loan Receivable: | $3,550 | | |
| 2016 Income Tax Overpayment: | $21,729 | | |
| Music Equipment: | $47,080 | | |
| 2015 Wells Cargo Trailer: | $9,500 | | |
| JLD, Inc. stock: | $48,000 | | |
| **Total property:** | **$495,514.43** | **Total property:** | **$950,431.00** |

The trial court then assigned the following debt to the parties:

| **To Husband** | | **To Wife** | |
|---|---|---|---|
| Loan for 2013 Ford F150 | -$6,946 | Marital residence mortgage | -$246,744 |
| Sun Trust Visa #2081 | -$59 | Macy's card | -$19 |
| BOA Visa #4547 | -$14,546.93 | Chase card #2629 | -$1,559 |
| Chase card #9908 | -$15,155.11 | | |
| **Total debt:** | **-$36,707.04** | **Total debt:** | **-$248,322.00** |

This resulted in a net award of $458,807.39 to Husband, which amounted to forty percent (40%) of the marital estate, and $702,109 to Wife, or sixty percent (60%) of the marital estate.

Additionally, the trial court awarded Wife: (1) rehabilitative alimony in the amount of $1,600 per month for twelve months to pay for additional vocational training; (2) transitional alimony in the amount of $4,000 per month for 54 months to assist with the mortgage payment; (3) alimony *in futuro* in the amount of $2,000 per month beginning upon the payoff of the mortgage debt on the marital residence or August 1, 2022, whichever date is earlier, as well as an additional monthly payment of alimony *in futuro* for Wife's health insurance, not to exceed $1,000 per month; and (4) alimony *in solido* in the amount of $49,306.66 for attorney's fees plus an additional $24,151 in unpaid expert witness fees from trial.

**ISSUES**

Both parties raise issues for us to consider on appeal. For his part, Husband identifies two issues in his Statement of the Issues on page five of his brief, but his Summary of the Argument does not fully comport with the issues stated by Husband.[4]

---

[4] The two issues as stated by Husband in his brief read:

(continued…)

Having reviewed both briefs to assure that Wife is not ambushed by Husband's failure to fully comply with Tenn. R. App. P. 27(a)(4) and (7),[5] Husband's issues appear to be those as stated in the summary of his argument which read:

I.      The Trial Court failed to equitably divide the marital estate.

      A.    The Trial Court failed to consider the length of the parties' marriage when dividing the marital estate.
      B.    The Trial Court failed to consider the marital debt when dividing the marital assets.

II.     The Trial Court erred in awarding Wife all four types of alimony.

      A.    The Trial Court erred in awarding Wife both alimony *in futuro* and rehabilitative alimony.
      B.    The Trial Court erred in awarding Wife transitional alimony and rehabilitative alimony.
      C.    The Trial Court did not consider that the division of the marital estate significantly favored Wife when determining the amount of alimony to award.

III.    The Trial Court's division of the marital estate coupled with an award of all four types of alimony rises to the level of punishment towards Husband for his actions during the marriage.

---

1. Whether the Trial Court abused its discretion in awarding Wife sixty-four percent (64%) of the marital estate as well as rehabilitative alimony, transitional alimony, alimony *in futuro*, and alimony *in solido*.

2. Whether the Trial Court used the correct legal standard by not including the marital debt when making an equitable division of the marital estate as a whole.

[5] Tenn. R. App. P. 27(a) states, in pertinent part, the brief of the appellant shall contain:

(4) A statement of the issues presented for review:

. . .

(7) An argument, which may be preceded by a summary of argument, setting forth:

(A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on . . ..

For her part, Wife contends the trial court abused its discretion when determining the amount of alimony awarded. Both parties seek to recover their attorney's fees on appeal.

## STANDARD OF REVIEW

"In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Tenn. R. Civ. P. 52.01. If the trial court makes the required findings of fact, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing Tenn. R. App. P. 13(d)). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 598–99 (Tenn. Ct. App. 2006) (citations omitted).

> Requiring trial courts to make findings of fact and conclusions of law is generally viewed by courts as serving three purposes. First, findings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision. Second, findings and conclusions also serve "to make definite precisely what is being decided by the case in order to apply the doctrines of estoppel and res judicata in future cases and promote confidence in the trial judge's decision-making." A third function served by the requirement is "to evoke care on the part of the trial judge in ascertaining and applying the facts." Indeed, by clearly expressing the reasons for its decision, the trial court may well decrease the likelihood of an appeal.

*Lovlace v. Copley*, 418 S.W.3d 1, 34–35 (Tenn. 2013) (internal citations and footnotes omitted).

While there is no bright-line test by which to assess the sufficiency of the trial court's factual findings, the general rule is that "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Id.* at 35. "Simply stating the trial court's decision, without more, does not fulfill [the Rule 52.01] mandate." *Gooding v. Gooding*, 477 S.W.3d 774, 782 (Tenn. Ct. App. 2015) (quoting *Barnes v. Barnes*, No. M2011–01824–COA–R3–CV, 2012 WL 5266382, at *8 (Tenn. Ct. App. Oct. 24, 2012)).

If the trial court fails to explain the factual basis for its decisions, the appellate court "may conduct a de novo review of the record to determine where the preponderance

- 8 -

of the evidence lies or remand the case with instructions to make the requisite findings of fact and conclusions of law and enter judgment accordingly." *Id.* at 783 (citing *Lovlace*, 418 S.W.3d at 36; *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997); *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005)).

Our review of a trial court's determinations on issues of law is de novo, without any presumption of correctness. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011).

## ANALYSIS

### I.  DIVISION OF THE MARITAL ESTATE

Husband contends the trial court erred in the division of the marital estate in two ways: (1) by failing to calculate the marital debt prior to determining the division of the marital assets; and (2) by failing to adequately consider the length of the parties' 17-year marriage when dividing the marital estate.

A trial court's division of marital property is a factual issue that we review de novo upon the record with a presumption of correctness. Tenn. R. App. P. 13(d); *Dellinger v. Dellinger*, 958 S.W.2d 778, 780 (Tenn. Ct. App. 1997). Trial courts have wide discretion in how they divide marital property, and therefore, marital property divisions are given great weight on appeal. *Id.* (citing *Wade v. Wade*, 897 S.W.2d 702, 715 (Tenn. Ct. App. 1994); *Wallace v. Wallace*, 733 S.W.2d 102, 106 (Tenn. Ct. App. 1987)). "The trial court's decision on the distribution of marital property is presumed correct unless the evidence preponderates otherwise." *Id.* (citing Tenn. R. App. P. 13(d); *Wallace*, 733 S.W.2d at 107). Our role as the appellate court "is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36-4-121(c) is consistent with logic and reason, and whether the trial court's division of the marital property is equitable." *Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007).

The division of a marital estate begins with the classification of the parties' property as either separate or marital property. *Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010). (citing *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009)). This is necessary because separate property is not part of the marital estate; therefore, a party's separate property is not subject to division. *Id.* (citing *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995)). "Thus, before equitably dividing the marital estate, the trial court must identify all of the assets possessed by the divorcing parties as either separate or marital." *Id.* (citing *Snodgrass*, 295 S.W.3d at 246). After classifying the divorcing parties' assets as either separate or marital, the trial court must then divide the marital estate equitably by weighing the relevant factors enumerated in Tenn. Code Ann.

§ 36-4-121(c) without regard to fault on the part of either party. *Id.* (citing Tenn. Code Ann. § 36-4-121(a)(1)).

## A. The Marital Debt

Husband contends the trial court erred in the division of the marital estate by, *inter alia*, failing to calculate the marital debt prior to determining the division of the marital assets. Wife counters by insisting the marital debt was not only considered but that a substantial majority of the marital debt was assigned to her. A review of the record reveals that Wife is correct on this point.

We begin our review of this issue by noting that Husband contends on page 18 of his brief that "Husband was assigned a majority of the marital debt in the amount of $38,756.93, while Wife only received $1,578.00 in marital debt." This is not only simply incorrect, it is grossly inaccurate. The trial court assigned the debt of the mortgage on the marital residence to Wife, with a balance of $246,744, and a Macy's store card and Chase card ending in #2629, the sum of which totaled $1,578. To Husband, the trial court assigned the debt owed on his 2013 Ford F150 truck, with a balance of $6,946, a Sun Trust Visa card ending in #2081 with a balance of $59, and a Bank of America Visa card ending in #4547 carrying a balance of $14,546.93.[6] Additionally, Husband was assigned the debt on the Chase card ending in #9908, which had a balance of $15,155.11, and was associated with business expenses for JLD, Inc. but also used by TT, with Husband's consent, for her personal expenses. Thus, Wife was assigned marital debt of approximately $250,000 while Husband was assigned approximately only $37,000 in debt. Considering this disparity, we find it disingenuous that Husband would contend that the trial court failed to consider the marital debts before making an equitable division of the marital estate.

Nevertheless, the total marital estate must be divided equitably, and in doing so the allocation of marital debt is analyzed under *Alford v. Alford*, 120 S.W.3d, 810 (Tenn. 2003). Under *Alford* the trial courts are required to follow four factors as guidelines in an equitable allocation of marital debt: "(1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt." *Id.* at 813. The record indicates that the trial court correctly analyzed the allocation of marital debt under the *Alford* factors; thus, the trial court did not fail to consider the marital debt before dividing the marital estate.

---

[6] This credit card had been used primarily by Wife for personal and family living expenses during the marriage. After Husband filed for divorce, he instructed his financial managers to start making only the minimum payments on this credit card balance, eventually "maxing out" its credit limit.

Before we leave this issue, and to fully address Husband's contentions, we acknowledge another of Husband's arguments — that in addition to the marital debt assigned to him, the trial court assigned Husband a significant portion of the remaining mortgage payments in the form of 54 monthly payments of $4,000 as transitional alimony totaling $216,000 and ordered him to pay Wife's attorney's fees in the amount of $49,306.66. Husband argues the amount of debt the trial court allocated to Husband is nearly three times greater than the amount of liquid assets he was awarded.

We find this contention misplaced because the foregoing reveals that Husband has conflated "marital debt" with "alimony." This is evident from Husband's contention that his alimony obligation of 54 payments of transitional alimony is an allocation of debt; it is not. To the contrary, it is alimony, as identified by the trial court. Moreover, the trial court's final order makes it crystal clear that "Wife shall be responsible for the satisfaction of the mortgage on the Marital Residence." Thus, contrary to Husband's arguments and contentions, Husband was not assigned the debt on the marital residence, Wife was assigned the bulk of the marital debt, and the trial court had considered the marital debt in determining how to divide the marital estate.

B. Length of the Marriage

Husband contends the trial court erred in the division of the marital estate because it "failed to consider the length of the parties' marriage when dividing the parties' marital estate." Wife contends Husband's argument is erroneous because the trial court did consider this factor. Nevertheless, in the event Husband is challenging the weight the trial court placed on this factor, "Wife submits the trial correctly weighed this factor in the context of all factors contained in Tenn. Code Ann § 36-4-121."

The record clearly reveals that the trial court considered the length of the marriage as a relevant factor in its determination. With that said, while Husband correctly notes that a long-term marriage is a factor that favors an equal division of the marital estate, Husband seeks to minimize the significance of other relevant factors. In *Harrington v. Harrington*, 798 S.W.2d 244, 245 (Tenn. Ct. App. 1990), this court explained:

We have said in prior cases that ownership of the marital estate should be presumed to be equal until proven otherwise. On the other hand, we have also said that **the statute does not mandate an equal division of the marital estate but requires an equitable division considering the factors in the statute**. The statute specifically recognizes the contribution of a homemaker to the accumulation of property from the earnings of the working spouse.

(internal citations omitted) (emphasis added).

- 11 -

In *Dellinger v. Dellinger*, wherein we affirmed a 65% – 35% division of the marital estate, we again acknowledged the legal principle that "[t]he long duration of this marriage is a factor favoring an equal division of the marital property. 958 S.W. 2d at 781. However, other factors justify the trial court's decision to award 65% of the marital property to Wife." *Id*. (internal citation omitted). As is the case before us, "Husband's earning potential far exceeds that of Wife." *Id*. Moreover, as is the case here, the court recognized that "[e]ven if Husband's practice declines over the upcoming years, as he predicts, his earnings will still far exceed Wife's earnings." *Id*. For these and other reasons, this court affirmed a 65% – 35% division of the marital estate even though the parties had been married for 30 years, which was 13 years longer than the marriage at bar. *Id*. at 781-82.

Recognizing that the length of a marriage is one factor to consider in the division of the marital estate, the record also reveals other relevant facts including that, at the time of trial, Wife was 48 and Husband was 58 years old. Wife has rheumatoid arthritis, whereas Husband is in relatively good health. Although Husband's career peaked in the mid-1990s, he remains a successful touring artist, grossing over $1.7 million in income in 2016, and owns a catalogue of songs that remain popular, some of which are regarded as classics in the country music genre. Husband has a support obligation for Kylie, and he financially supports an adult son from a previous marriage who is disabled. Wife, on the other hand, had not worked outside the home for 17 years, and had only just begun working at a bookstore part time after Husband filed for divorce. The trial court determined that Husband's earning power was significantly greater than Wife's, and that Husband had substantially greater ability to acquire capital assets in the future. Conversely, the trial court determined that Wife had no marketable skills that would qualify her to earn income substantially greater than minimum wage, and because it would take all of her income to live, Wife's ability to acquire capital assets in the future was practically non-existent. Furthermore, Wife was the primary residential parent for Kylie, who was in the eighth grade at the time of trial, and the trial court determined that Wife had no independent means of providing a home for Kylie who had lived in the marital residence her entire life. The trial court found this factor weighed in favor of allowing Wife to remain in the marital home. The lifestyle the parties enjoyed during the marriage exceeded Husband's ability to earn income, which resulted in a gradual dissipation of assets. Additionally, Husband dissipated assets in pursuit of his relationship with TT.

In its order, the trial court addressed the length of the parties' 17-year marriage as one of many statutory factors in Tenn. Code Ann. § 36-4-121(c)(1) to consider in its lengthy analysis. The trial court also concluded that the "economic disparity weigh[ed] heavily in favor of distributing to Wife a greater share of the marital estate than Husband."

In reaching an equitable division, some factors may be significant while the importance of others may be diminished depending on the unique facts of each case. *See Cronin-Wright v. Wright*, 121 S.W.3d 673, 675 (Tenn. Ct. App. 2003). "The decision is not a mechanical one and is not rendered inequitable because it is not precisely equal, or because both parties did not receive a share of each piece of property." *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994) (citations omitted). In considering the relevant factors as the trial court obviously did, we find that the trial court's division of the marital estate is consistent with the statutory factors enumerated in Tenn. Code Ann. § 36-4-121(c) and is supported by the evidence. *See Larsen-Ball*, 301 S.W.3d at 231; *see also Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002)). Accordingly, we affirm the trial court's division of the marital estate.

## II.    ALIMONY

Husband challenges the multiple awards of alimony on various grounds. First, he contends the trial court erred by awarding Wife "both Alimony *in futuro* and Rehabilitative alimony." Second, he contends it erred by awarding "Transitional Alimony and Rehabilitative Alimony." Third, he contends the trial court did not consider that the division of the marital estate significantly favored Wife when determining the amount of alimony to award. For her part, Wife contends the trial court erred in the amount of alimony awarded to her based on the evidence of Wife's need and Husband's ability to pay presented at trial.

### A.  Alimony *In Futuro* and Rehabilitative Alimony

Husband's first contention is the trial court erred by awarding Wife Alimony *in futuro* **and** Rehabilitative alimony. Wife insists the court properly exercised its discretion by awarding both types of alimony.

Tennessee recognizes four types of spousal support: (1) rehabilitative alimony; (2) transitional alimony; (3) alimony *in solido*; and (4) alimony *in futuro*. *Mayfield v. Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012) (citing Tenn. Code Ann. § 36-5-121(d)(1)). A court may award rehabilitative alimony, alimony *in futuro*, transitional alimony, or alimony *in solido* "or a combination of these, as provided in this subsection (d)." Tenn. Code Ann. § 36-5-121(d)(1).

Rehabilitative alimony is a form of short-term support, *see Gonsewski v. Gonsewski*, 350 S.W.3d 99, 110 (Tenn. 2011), that is "intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse." *Id*. at 108 (citing Tenn. Code Ann. § 36-5-121(e)(1); *Robertson*, 76 S.W.3d at 340-41).

- 13 -

Alimony *in futuro* is a form of long-term support, *Mayfield*, 395 S.W.3d at 115, which is intended to provide long-term support until the death or remarriage of the recipient. *Gonsewski*, 350 S.W.3d at 107 (citing Tenn. Code Ann. § 36-5-121(f)(1)). When considered in the context of rehabilitation and/or rehabilitative alimony, Tenn. Code Ann. § 36-5-121(d)(3) states: "Where there is relative economic disadvantage **and rehabilitation is not feasible**, . . . the court may grant an order for payment of support and maintenance on a long-term basis or until death or remarriage of the recipient, except as otherwise provided in subdivision (f)(2)(B)." (Emphasis added).

The statutory scheme recognizes that, in some cases, only partial rehabilitation is possible. Tenn. Code Ann. § 36-5-121(d)(4); *Gorman v. Gorman*, No. M2010-02620-COA-R3-CV, 2011 WL 5599867, at *4–10 (Tenn. Ct. App. Nov. 16, 2011); *Anderson v. Anderson*, No. M2005-02029-COA-R3-CV, 2007 WL 957186, at *5–6 (Tenn. Ct. App. Mar. 29, 2007). Moreover, Tenn. Code Ann. § 36-5-121(d)(4) expressly authorizes a court to award alimony *in futuro* "either in addition to an award of rehabilitative alimony, where a spouse may be only partially rehabilitated, or instead of an award of rehabilitative alimony, where rehabilitation is not feasible." Therefore, the trial court was authorized to award Wife both alimony *in futuro* and rehabilitative alimony, provided it found that she could be "only partially rehabilitated." *Id*.; *see also Lunn v. Lunn*, No. E2014-00865-COA-R3-CV, 2015 WL 4187344, at *11 (Tenn. Ct. App. June 29, 2015) (holding that the spouse could be partially rehabilitated and was entitled to receive both alimony *in futuro* and rehabilitative alimony).

Husband insists Wife is precluded from receiving alimony *in futuro* because "the trial court found that Wife's rehabilitation is feasible." In his brief, Husband cites to page 266 of the record as the factual basis for this statement; however, the trial court did not find that Wife could achieve an earning capacity that would permit her standard of living after the divorce to be reasonably comparable to that enjoyed during the marriage, or to the post-divorce standard of living expected to be available to Husband. Tenn. Code Ann. § 36-5-121(d)(2). To the contrary, the trial court made the following findings on pages 266 and 267 that are relevant to this issue:

> Wife is young enough to be a productive member of the work force. She has demonstrated an admirable work ethic and has realistic ambitions for improving her ability to earn income. Nevertheless, during the marriage, the Parties mutually organized their lives in a structure whereby Wife was out of the work place for over a decade and devoted herself to being the primary care giver for their child. Consequently, Wife has been entirely dependent on Husband to provide her with the economic support she needed for herself and Kylie. From all of the foregoing, the Court concludes Wife needs rehabilitative, transitional and permanent alimony[.]

- 14 -

Also relevant to whether Wife could be partially or fully rehabilitated are the trial court's findings that read:

> Wife is 48 years of age. . . . Wife has been diagnosed with rheumatoid arthritis for which she takes prescription medication under the supervision of a medical doctor.
>
> . . .
>
> Husband's earning capacity is far greater than Wife's. **In 2016, the Parties' joint federal income tax return (Ex. 36) reported gross income from all sources in the amount of $1.722 million. Wife's individual contribution to this total amount was roughly $600.** Husband earned W-2 income in 2016 in the amount of $393,027. He reported business income of $63,492 and income from royalty payments of $4,419. **The 2016 joint return reports gross income of $459,242, adjusted gross income of $440,866 and taxable income of $421,774. Wife is currently employed part-time at a retail book store where she makes, on average, $1,256 per month**.

(Emphasis added) (footnotes omitted).

Based on the foregoing, and the entirety of the trial court's findings, we find no support for Husband's assertion that the trial court found that it was feasible for Wife to be rehabilitated to the extent that she could achieve an earning capacity that will permit her standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to Husband. *See* Tenn. Code Ann. § 36-5-121(d)(2).

### B. Transitional Alimony and Rehabilitative Alimony

Husband contends the trial court erred by awarding transitional alimony **and** rehabilitative alimony. Wife argues the trial court had the discretion to award both. We have determined that Husband is correct on this issue.

Wife relies on Tenn. Code Ann. § 36-5-121(d)(1) which states, "The court may award rehabilitative alimony, alimony *in futuro*, also known as periodic alimony, transitional alimony, or alimony *in solido*, also known as lump sum alimony **or a combination of these**, as provided in this subsection (d)." (Emphasis added). However, as the statute expressly provides, the discretion to award "a combination of these" is subject to "subsection (d)" which states that "[t]ransitional alimony is awarded when the court finds that **rehabilitation is not necessary**, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection." Tenn. Code Ann. § 36-5-121(d)(4) (Emphasis added).

- 15 -

The differing roles of these two distinct categories of support has been discussed in detail by our Supreme Court as follows:

> **The fourth category of support, transitional alimony, is appropriate when a court finds that rehabilitation is not required but that the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce**. Simply put, this type of alimony "aid[s] the person in the transition to the status of a single person." In contrast to rehabilitative alimony, which is designed to increase an economically disadvantaged spouse's capacity for self-sufficiency, transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income.

*Gonsewski*, 350 S.W.3d at 109 (internal citations omitted) (emphasis added).

Furthermore, in the case of *Lunn v. Lunn* where the wife's ability to achieve partial rehabilitation was not disputed, this court opined:

> [T]he award of rehabilitative alimony is proper. We conclude, however, that it is appropriate to modify the transitional alimony award to an award of alimony *in futuro*. **As previously explained, transitional alimony should be awarded where rehabilitation is not necessary**. Tenn. Code Ann. § 36–5–121(d)(4). If, as here, the disadvantaged spouse can be only partially rehabilitated, an award of alimony *in futuro* may be granted in addition to rehabilitative alimony. Tenn. Code Ann. § 36–5–121(d)(4). Having determined that the trial court correctly found that Wife would experience an ongoing need for alimony beyond the period of rehabilitation, we conclude alimony *in futuro* would be the more appropriate form of this award. We therefore modify the trial court's judgment accordingly.

*Lunn*, 2015 WL 4187344, at *11 (footnote omitted) (emphasis added).

For the foregoing reasons, we have determined that Wife may not receive both transitional alimony and rehabilitative alimony, and we resolve this conflict in the following section.

### C. Rehabilitative Alimony

The trial court awarded Wife rehabilitative alimony in the amount of $1,600 per month for twelve months, for a total of $19,200, with the intent that this support would

pay for cosmetology school so that Wife could pursue a new career as a professional makeup artist. However, Wife did not request rehabilitative alimony. Moreover, Wife's attorney specifically argued she could **not** be rehabilitated. In speaking candidly to the trial court, Wife's attorney stated he did not "think this [was] a case for rehabilitative alimony when we have a woman [who is] 48 years old, with work expectancy of 14 years, that she can be rehabilitated to be able to have the lifestyle that she has had with [Husband] and has enjoyed that income."

As previously discussed, rehabilitative alimony is "intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse." *Gonsewski*, 350 S.W.3d at 108 (citing Tenn. Code Ann. § 36-5-121(e)(1)). The statute also now recognizes that, in some cases, only partial rehabilitation is possible. Tenn. Code Ann. § 36–5–121(d)(4); *Gorman*, 2011 WL 5599867, at *4–10; *Anderson*, 2007 WL 957186, at *5.

During Wife's cross examination at trial, she was asked about her previous part-time job as a dog groomer. Wife testified that she was no longer able to work as a dog groomer because her rheumatoid arthritis prevented her from being able to stand for long periods of time and hold things with her hands. After testifying about her current part-time job at a bookstore, Wife was then asked if she had considered any further training or education to help her re-enter the workforce fulltime. Wife responded that she was interested in going to cosmetology school to become a professional makeup artist, and that she believed her contacts within the music industry were sufficient to help her break into the field. However, the evidence suggests that these were mere hopes and dreams, and not a realistic path for Wife's rehabilitation. When asked numerous times about the cosmetology school she was interested in attending, Wife admitted it had been "a while" since she looked into it, she had no idea how much money she could expect to earn as a professional makeup artist, she had no immediate plans to attend cosmetology school, and was not sure if or when she would be able to attend due to her responsibilities in caring for Kylie. After further questioning, Wife said she thought the school's tuition was $19,000, and she believed it was a six-month program, but no evidence was introduced by either party documenting any specifics of the cosmetology program.[7]

The trial court's decision to award rehabilitative alimony is a discretionary decision which we review pursuant to the deferential abuse of discretion standard.

_____

[7] The evidence also reveals that Wife may not be physically able to perform the job responsibilities of a professional makeup artist if it required her to stand on her feet and use her hands to apply makeup for extended periods of time because Wife testified she could no longer be a dog groomer due to her rheumatoid arthritis.

Nevertheless, "[d]iscretionary decisions must take the applicable law and the relevant facts into account." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010); (citations omitted). Accordingly, as our Supreme Court has instructed, we review a discretionary decision to determine "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions." *Id*. (citations omitted). Moreover, we "review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness." *Id*. at 525 (citations omitted).

Based on our review of the evidence relevant to this issue, we have concluded that the evidence preponderates against the factual findings underlying the trial court's determination that rehabilitation by attending a cosmetology school is appropriate or feasible. *See id*. at 525. Because the discretionary decision to award rehabilitative alimony lacks an evidentiary foundation, *see id*. at 524, we vacate the award of rehabilitative alimony.

D. The Amount of Alimony

Husband contends the trial court "did not consider that the division of the marital estate significantly favored Wife when determining the amount of alimony to award." Wife disagrees with Husband's reasoning, but submits that "the trial court abused its discretion when determining the *amount* of alimony awarded." Simply put, Husband contends Wife received too much alimony, and Wife contends she did not receive enough.

At trial, Wife presented a documented need of $7,500 per month in spousal support. Other than Husband challenging a $250 monthly payment of attorney's fees, Wife's expenses were received into evidence without dispute, and the trial court made no findings against these figures. We have set aside the award of rehabilitative alimony; thus, the three categories of alimony at issue are transitional, *in futuro*, and *in solido*. The trial court awarded Wife transitional alimony in the amount of $4,000 per month for a maximum of 54 months to assist with the mortgage payment and alimony *in futuro* in the amount of $2,000 per month beginning upon the payoff of the mortgage debt on the marital residence or August 1, 2022, whichever date is earlier, as well as an additional monthly payment of alimony *in futuro* for Wife's health insurance, not to exceed $1,000 per month. Additionally, the court awarded Wife alimony *in solido* for attorney's fees in the amount of $49,306.66 and for expert witness fees in the amount of $24,151.

When determining whether an award of alimony and the "nature, amount, length of term, and manner of payment" is appropriate, courts are required to consider the following factors set forth in Tenn. Code Ann. § 36-5-121(i):

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property, as defined in § 36-4-121;
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Of these twelve factors, the two most important factors to consider are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Gonsewski*, 350 S.W.3d at 110.

1. The Amount of Alimony *in futuro* and Transitional Alimony

Husband's challenge to the amount of alimony awarded is based on a pigeon-hole approach, focusing only on the division of the marital estate, while ignoring numerous other factors that must be considered. By focusing only on the marital assets, Husband attempts to overemphasize the significance of the division of the marital estate while deemphasizing, if not eliminating from consideration, other factors that are relevant.

Contrary to Husband's wishes, we will follow the established protocol for determining the appropriate amount of alimony to award.

Husband's erroneous contention notwithstanding, we acknowledge that Wife received approximately 60% of the marital estate; however, her assets are not income producing, while the assets awarded to Husband were either income producing or Husband will use them to earn income.[8] Moreover, the trial court appropriately considered the other relevant factors and made thorough findings of fact that support the determination that Wife is economically disadvantaged. *See* Tenn. R. Civ. P. 52.01 ("In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.").

However, in setting the amount of alimony to award for both alimony *in futuro* and transitional alimony, it is clear that the trial court erroneously considered "speculative income" in determining Husband's ability to pay alimony. This is evident from the Memorandum and Order wherein the trial court stated that Husband's music career had already peaked, and

> **[a]t some unknowable point in the future**, Husband will no longer be able to endure the rigors of live performance tours. The Court must take into account this ebb in Husband's ability to generate revenue and not set alimony *in futuro* at a level greater than Husband's predictable ability to sustain payment of such support.

(Emphasis added).

Considering what might happen to Husband's income at some unknowable point in the future conflicts with the legal principle that an award of alimony "must be based on the factors known at the time of the hearing." *Ford v. Ford*, 952 S.W.2d 824, 829–30 (Tenn. Ct. App. 1996). In the case of *Mimms v. Mimms*, we determined that the trial court applied an incorrect standard when it essentially took judicial notice of its perception that the husband was a nationally-known music business attorney and set the husband's alimony based on his potential to earn substantially more income. 234 S.W.3d 634, 637–38 (Tenn. Ct. App. 2007). Accordingly, in the case at bar, the trial court erred by basing Husband's present ability to pay alimony on what might happen at "some unknowable point in the future." *See id.*

---

[8] For example, the tour bus and music equipment will aid Husband in his concert performances, which are a significant source of his income. Also, Husband was awarded all royalties and future income from his music catalog and recordings, which will produce income without any additional efforts by Husband.

By considering that Husband would have less income in the future, the trial court artificially deflated Husband's present ability to pay alimony, which is one of the two most important factors to consider in setting the amount of alimony. *See Gonsewski*, 350 S.W.3d at 110. Moreover, by considering "speculative income" as a factor in setting the amount of alimony, the trial court failed to apply "the most appropriate legal principles applicable to the decision." *Lee Med., Inc.*, 312 S.W.3d at 524. Accordingly, the discretionary decision was not based on one of the most important factors to consider in setting the amount of alimony. *See Gonsewski*, 350 S.W.3d at 110.

Therefore, we reverse the amount of the awards for alimony *in futuro* and transitional alimony and remand to the trial court to make additional findings of fact and conclusions of law to determine, among other relevant factors, Wife's need and Husband's ability to pay based upon the "factors known at the time of the hearing," *Ford*, 952 S.W.2d at 829-30, and enter judgment accordingly. The foregoing notwithstanding, unless and until the trial court enters an order or orders revising the amounts, the amount of the awards shall remain in effect.

### 2. The Amount of Alimony *in solido*.

As for the award to Wife of alimony *in solido* in the amount of $49,306.66 for attorney's fees plus and an additional $24,151 to cover the parties' joint expert witness fees from trial, we begin by noting that alimony *in solido* is a form of long-term support "typically awarded to adjust the distribution of the marital estate." *Mayfield*, 395 S.W.3d at 115 (citing *Gonsewski*, 350 S.W.3d at 108). "Alimony *in solido* may be awarded in lieu of or in addition to any other alimony award, in order to provide support, including attorney fees, where appropriate." Tenn. Code Ann. § 36–5–121(d)(5). It is not modifiable and does not terminate upon the death or remarriage of the recipient. *Mayfield*, 395 S.W.3d at 115.

With respect to an award of attorney's fees in divorce cases, our Supreme Court has stated:

> It is well-settled that an award of attorney's fees in a divorce case constitutes alimony *in solido*. The decision whether to award attorney's fees is within the sound discretion of the trial court. As with any alimony award, in deciding whether to award attorney's fees as alimony *in solido*, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36–5–121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses or the spouse would be required to deplete his or her resources in order to pay them.

- 21 -

> Thus, where the spouse seeking such an award has demonstrated that he or
> she is financially unable to procure counsel, and where the other spouse has
> the ability to pay, the court may properly grant an award of attorney's fees
> as alimony.

*Gonsewski*, 350 S.W.3d at 113 (citations omitted). Alimony *in solido* is also commonly awarded in the form of discretionary costs and other litigation fees. *See Andrews v. Andrews*, 344 S.W.3d 321, 340 (Tenn. Ct. App. 2010); *see also Owens*, 241 S.W.3d at 497. As with any award, the single most important factor in considering whether to award alimony *in solido* is the need of the requesting spouse, and the ability of the other spouse to pay. *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001).

Although Wife was awarded a larger share of the marital estate, the bulk of what she received consisted of the marital residence, which is not an income-producing asset. Moreover, the trial court found that Husband had the ability to pay his attorney's fees whereas Wife did not, and without an award of alimony *in solido*, Wife would be forced to sell the marital residence to pay for her attorney's fees and expert witness expenses, thereby undercutting the reason for awarding her the residence.

We agree with the trial court's determinations of Wife's need for alimony *in solido* to pay these fees. We have also determined that the amount of attorney's fees and expert witness fees awarded were reasonable and necessary, given that the amount in controversy involved a marital estate in excess of $1 million dollars and complex valuation issues for a closely-held business entity and intangible, royalty-generating intellectual property. Therefore, we affirm both awards of alimony *in solido*.

### III.    WHETHER THE AWARDS WERE PUNITIVE AGAINST HUSBAND

Husband contends the division of the marital estate coupled with an award of all four types of alimony rises to the level of punishment towards Husband for his actions during the marriage. We respectfully disagree.

The court is allowed to consider the parties' relative fault when determining spousal support, Tenn. Code Ann. § 36-5-121(i)(11); however, fault should not be applied punitively. *Tait v. Tait*, 207 S.W.3d 270, 278 (Tenn. Ct. App. 2006). Moreover, a court must "equitably divide, distribute or assign the marital property between the parties **without regard to marital fault** in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1) (emphasis added).

Here, Husband relies on statements by the trial court in its final order to support his conclusion that the awards were punitive. For example, the trial court noted that Husband "betray[ed] his marital obligations through sexual pursuit of other women" while "Wife was trying to help Husband moderate his unhealthy behavior." The court

also stated, "The evidence shows that Husband made a conscious decision to discard his existing marital relationship with the mother of his minor child, in order to pursue a new relationship with a younger woman and her child." Indeed, the trial court made these statements, and the record fully supports these findings of fact; however, Husband has failed to show that any of the awards were punitive. To the contrary, we have determined that the trial court erred in Husband's favor by setting alimony based on the speculation that Husband's income would diminish in the future. This is not consistent with the allegation that the trial court's awards were motivated by the intent to punish Husband. Furthermore, the trial court's complimenting Husband for being a doting father to Kylie and financially supporting his adult son with special needs is inconsistent with a motivation to punish.

Considering the foregoing and the entire record, we find no basis upon which to conclude that the trial court's division of the marital estate or the awards of alimony were punitive in nature towards Husband, or that they constituted an abuse of discretion.

## IV. ATTORNEY'S FEES

Both Husband and Wife seek to recover their attorney's fees on appeal. Whether to award attorney's fees on appeal is within this court's sole discretion. *Wills v. City of Memphis*, 457 S.W.3d 30, 51 (Tenn. Ct. App. 2014) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). When considering a request for attorney's fees, we will consider "the requesting party's ability to pay, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other relevant equitable factors." *Culbertson v. Culbertson*, 455 S.W.3d 107, 158 (Tenn. Ct. App. 2014) (citing *Moran v. Willensky*, 339 S.W.3d 651, 666 (Tenn. Ct. App. 2010)). After considering these factors, we deny Husband's request. However, because Wife is clearly the disadvantaged spouse and, as the trial court found by awarding her attorney's fees incurred in the trial court proceedings, we find that Wife is entitled to recover the reasonable and necessary attorney's fees incurred on appeal. Accordingly, we remand this issue for the trial court to make an award in the amount it deems appropriate.

## IN CONCLUSION

The judgment of the trial court is affirmed in part, vacated in part, reversed in part, and remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellant, Joe Logan Diffie.

_____
FRANK G. CLEMENT JR., P.J., M.S.